Good morning, Your Honor. My name is Terry Wood and I represent Mr. Mahan, the appellate in this cause. I would request to reserve two minutes for rebuttal. So, counsel, just watch the clock. Thank you. This case raises an important but narrow legal issue as to whether a defendant who uses his drugs as partial payment for firearms thereby possesses the firearms in furtherance of his drug crime. All Ninth Circuit precedent thus far interpreting the Possession and Furtherance Clause of 924C has required that the defendant intend to use the firearm and also required that it serve some emboldening purpose. Well, now, the cases that talk about use, of course, are not particularly helpful here because we have a different status, or statute, I suppose. Possession in furtherance of is what we need to focus on. I understand that, Your Honor, but the Ninth Circuit cases, Mann, Krauss, and other cases cited in the brief, discuss possession in furtherance of, and they specifically use the language that the defendant must have intended to possess the firearm with the intent to use it in facilitating the drug trafficking crime. The case law, all of the reported Ninth Circuit cases to date that deal with possession in furtherance of a drug trafficking offense have all focused on whether the firearm would have served some purpose to protect or protect the drug activity or embolden the drug dealer to commit the drug offense. Not a single case has dealt with the issue before this Court, which is whether when the firearm's only role is a means of currency – I'm sorry, the drug's only role is a means of currency to acquire the firearm, whether that constitutes possession in furtherance. Your Honor, in this case, I'm going to say that the defendant's intent was to possess  I'm not going to say that the defendant's intent was to embolden the drug activity. I agree with this idea that the Ninth Circuit really needs to make this determination for the first time, correct? I do, Your Honor. I thought that's what you said when you began. If I look at the Sixth Circuit, haven't they really determined, and other circuits, that this is not a very big question and that we ought to just suggest that it's okay? Your Honor, I would make two distinguishing points there. One is that those circuits, which I think is Frederickson and Luke Sanchez, those I mean, my worry is that you're really suggesting that we ought to create a circuit split with your idea of how to interpret the statute. Well, Your Honor, I'm not suggesting that. I think that Mr. Mahan's case is distinguishable, and it raises a narrow issue, narrower than the ones raised and addressed in Frederickson and Luke Sanchez. And there, the courts basically held that the firearm furthered the drug trafficking crime because of the defendant's willingness to accept a firearm in exchange for his drugs. In other words, it focused on a defendant who was in the business of dealing drugs and was willing to accept a firearm in exchange as a means of currency. In Mr. Mahan's case, the parties, I think there is no dispute in the issue that Mr. Mahan's intent was to acquire firearms, not to sell drugs, and that he used a small quantity of very diluted methamphetamine as partial payment. Well, but if I read U.S. v. Frederick, which is a Sixth Circuit case, I quote the language. Here, however, we conclude the acquisition of a firearm in exchange for drugs is a sufficient specific nexus between the drugs and the guns to constitute possession and furtherance. Thus, the district court's instruction was proper. As a matter of logic, a defendant's willingness to accept possession of a gun as consideration for drugs he wishes to sell does promote or facilitate that illegal sale. Your Honor, I actually quote that same passage of Frederick's on page 12 of my reply brief. I do. I see that, but I'm trying to figure out how, then, we can differentiate this case. Because of the last sentence that the Court didn't read, which is, if a defendant did not accept possession of the gun and instead insisted on being paid fully in cash instead of the firearms, then some drug sales would not occur. Okay. I understand your argument. My other – my further distinguishing point from Frederick's and Luke Sanchez, which basically adopted Frederick's, is that those cases were decided before the Watson decision. And at that time, most circuits had presumed that you would – that if you traded a – a drugs for a gun, that that was the same as trading a gun for drugs. In other words, they thought that there was a symmetry in 924C. And I think what Watson tells us is that's not correct. There isn't this symmetry where both sides to a guns and drugs transaction can be held accountable under 924C. And I don't see that there is a reason to simply read the possession in furtherance of as – as creating this symmetry that was rejected in Watson, particularly when – assume Mr. Mahan had possessed the guns at the very outset. I think the government argues that he almost possessed them from the time they arrived. At the time he does the drug transaction, he is inside the house with friendly buyers, you know, giving them a small quantity of drugs. The guns are unloaded. They're outside in another building. So there's no accessibility, strategic location of the guns, nothing that accords with existing precedent from the Ninth Circuit interpreting the possession in furtherance clause of 924C. So I think the government needs to do something more than tell the Court it's just logical that because he – the guns played a role – I'm sorry, the guns played a role in the transaction that that's enough, any role will suffice. And in fact, the case cited by the government in its supplemental – letter of supplemental authority, the Thongsby case, the Ninth Circuit specifically rejected the argument that simply because firearms play a role in a drug transaction does not necessitate as a matter of law a finding of commission of 924C. But you will agree with me, won't you, that Watson v. the United States, as well as Bailey and Smith, are really focusing on the use prong of the statute rather than the in furtherance prong? Yes, Your Honor. So if, in fact, one is focusing on the other prong of the statute, we would be, in fact, unless we differentiate on facts, which you're suggesting creating the circuit split by not going along with what the Sixth has done. I'm sorry. If we take your argument, we would be creating a circuit split, because if we do not differentiate the facts of Frederick from this case, we'd be creating a circuit split on a prong that we don't have any advice from up on high as to how to do it. I'm sure that would be argued, Your Honor. Again – Well, all I'm trying to do is, what do you say?  Well, I'm not saying that we should differentiate on facts alone, which you seem to want to do, and I appreciate your argument, but we really are in an in furtherance statute, not a use statute, and I'm interpreting in furtherance language, correct? That's correct, Your Honor. I would just say that we have to look at where the in furtherance language came from, and it came from Bailey interpretation of use. And so it was designed to – it's not – it's not some separate thought that Congress came up with as a separate means to – to violate the statute. It does dovetail into the use or carry provision. Counsel, you're down to about a minute. You may reserve. You certainly may. We'll hear from the government. Please, the Court. I'm Frank Faggion, the prosecutor responsible for this case. A couple of months ago, this Court in the Thomsey case said as a general rule, a firearm that played a role in a drug crime would likely also be in furtherance of that crime. Judge Acuda in that case wrote, Whether the firearm played a role in a defendant's drug trafficking crime turns on whether the defendant intended that it should. That intent language came from the Kraus decision. Now, you need to go to Kraus, if you like history. Kraus is kind of interesting, because at 370 Fed 3rd, page 967, this Court, the Ninth Circuit, started our journey – there are about 13 cases in the Ninth Circuit that deal with possession of a firearm in furtherance of a drug crime – started our journey by citing a Tenth Circuit case, the Basham case, B-A-S-H-A-M. I cite that. And they cited the Basham case at page 967 to say, we look to the defendant's intent. Well, interestingly enough, the Luke Sanchez case is a Tenth Circuit case. So kind of our starting point in this circuit is with the Tenth Circuit, and Luke Sanchez, of course, is a Tenth Circuit case that came down. Now, in fairness to counsel, in this Court, the two primary cases I cite, the published opinions, if you will, that are significant, both predated the Watson decision. I think Luke Sanchez was in April of 2007, and Watson didn't come down until December of 2007. Frederick's was a couple of years before that. But the logic of the Sixth and Tenth Circuits certainly apply to this case. That was the reason why this case was charged the way it was. Now, we have the – another circuit, I believe it was, the Sterling case in 2009, and that's the second – or, excuse me, the Fifth Circuit. In January 2009, they assumed that the type of conduct that we have here would constitute a violation of this particular alternative means approving a violation of 924C. By the way, this Court has described the alternative ways in Areola, which is a case I cite. That was a Ninth Circuit case in which they looked at the two different ways you could violate 924C. And so we're dealing with, if you will, new territory in this case. So my counsel and I are correct. This is a case of first impression for this Court. Now, factually speaking, why are we here? Well, in the Mosley case, I think it was Judge Tolman said that when you have these types of factually complex cases, we trust the jury to resolve them, let the jury use their common sense, and focus on the defendant's intent. In this trial, the questions I asked of the informants, the drug dealers, the people  who were involved in this case, they said, well, we trust the jury to resolve them. We trust the jury to use their common sense, and we trust the jury to resolve them. Now, when you focus on a defendant's intent, and you're dealing with the witnesses I have in this case, you don't listen much to what they say. You watch the actions. And what were the actions here? Why were the guns at the defendant's residence? Who told them to bring the guns to that residence? The defendant. The phone call was made by these two young drug dealers or drug addicts who had done the burglary. One of them had done the burglary. The other one was trying to give a call to his mom because she liked shotguns. She was an addict, too. And the defendant gets on the phone and says, I'm interested in the .357 and the .444 caliber rifle, you know, the Vekaro revolver. And when the young man who's trying to unload these guns for drugs, he's an addict. So when we say, what's the intent here about the drug trafficking crime? Mr. Mahan's no fool. He understood what the currency would be in this case. And he said, bring them all over. Why did the guns end up in the defendant's possession to begin with? Now, defense counsel makes an argument late in their brief, in a reply brief, talking about ownership, that the guy really didn't possess the guns until he owned them. Well, that argument was rejected 13 years ago in the Caster line. And by the way, it was made by the government on that occasion. We tried to say that if you had ownership, that was the equivalent of possession. And this court said, no, it's not. We have actual possession, and we have constructive possession. So once these guys brought the guns over, what happened? Again, the actions speak the loudest. When the guns first got there, the defendant and his mother, the primarily defendant, depending on who you want to believe, provided these young addicts with methamphetamine. Now, sometimes you go to an insurance company, and they give you a cup of coffee or a glass of water before they sell you a product. In this world, it's methamphetamine. So they had a couple of bowlfuls. Bring the guns in, and they're brought into the living room to begin with. And by the way, if you're wondering about the pages that we're interested about in my supplementary excerpt of record, I try to be precise. I believe those are from pages 127 to 148. Those give you the facts. So after the guns come into the living room, mama gets upset and says, take them out to the shed. But even before they go out to the shed, the defendant looks at them, according to the testimony. Once they get out in the shed, the guns are lined up. Now, no deal's been cut yet. Look to the actions, not the words of all these drug addicts. And the actions is, Midswood's client handles a .357. He's interested in that one. He actually possesses that gun. He actually possesses the .444 caliber rifle. He's interested in that one. And then he makes an offer for all the guns. Who was the one that proposed the deal? Did our little addicts go ahead and say, we want meth? Again, look at the transcript. Mr. Isabel, the burglar, and Mr. Copley, the addict, who was trying to unload the guns, said it was the defendant's idea to unload the drugs. Did it play a role, as Judge Acuda said, in the most recent case in the Ninth Circuit, Fonse? Did it play a role? What was the defendant's intent that it play a role? It was the defendant's purpose to bring the guns into this transaction so that he could get rid of his drugs, cut as they were. And they were lousy drugs, according to two guys that smoked the drugs afterwards when they got paid. But at that point, the defendant possessed them actually and constructively in his shed before the deal was done. After that, he makes the offer. Simple contract law. Who made the offer and what did the offer consist of? This might be a different case. Had these addicts say, we want meth, we don't want cash. But it was the defendant that made the offer. And of course, these addicts jumped at it. They already had a couple bowlfuls, they wanted more. He offered cash and drugs. So then they wait later that night or early that morning, and of course on drug time, you don't know when that was. But that's when he paid out and he put it out of his bottle or baggie, depending if you believe Isabel or Copley. But he paid the meth amphetamine at that point. And these addicts used it right away. In showing the defendant's intent, Judge Aiken allowed me to show that after he got possession of the guns, Mr. Mahan bragged about that to the informant, not very bright, but we had an informant, saying I exchanged these guns for drugs and cash. But we find out from his drug supplier, Ms. Torres, why he engaged in this drug trafficking transaction. And that was because he wanted four of these guns to be exchanged for a half ounce of meth amphetamine or cash. That evidence came in because it showed his intent for engaging in this transaction to begin with. Now you put this all together, gentlemen, and what you have is Judge Acuda's general rule, our case fits right in the middle of that. Now, in fairness to this Court, like I warned Judge Aiken when the Watson decision was pending, we don't know what the Supreme Court's going to do with this decision, possession and furtherance. We have the Sixth Circuit and Tenth Circuit who have published opinions before Watson. We have an assumption that this violates the law in the Fifth Circuit after Watson. I did something I normally don't do, and that's put a couple unpublished opinions in there for persuasive value only under Rule 32-1. Counsel, are there cases in conflict? No, I couldn't find any. So the chances are, the chances that the Supreme Court would grant cert in any of these cases if they're still in conflict would not be very great right now. Judge, I've been doing this 32 years, and I don't want to predict what the Supreme Court's going to do. All right, okay. And I know we have a new, Judge Souter wrote the Watson opinion. Judge Ginsburg had a concurrent opinion in Watson. Judge Souter's gone, and so do my heirs there now. And for a guy that's going bald after all these years, I'm not about to predict what they're going to do. Very well. I think the argument in this case, which is the one I put together before Watson came down, was the fact that I looked at the defendant's actions as did the jury, as did Judge Aiken. You know, I like to give credit to the district court judge here, and Judge Aiken, when she denied the motion to dismiss, didn't just deny it. She could have, just on the jurisdictional ground. In fact, procedurally, Judge Smith has nodded his head. He knows that's the case. But what she did is she also went a step further, somewhat at my suggestion, I might add, and said, well, you know, what do you think? You know, advisory rulings are something you're not supposed to do as a judge. But she went forward and said, my analysis here is different than Watson. Watson had been decided. I put that case in front of her. Watson's been decided. My analysis is different based upon these facts and based upon the jury instructions, which are good instructions in this case. So, Judge O'Scanlan, if you're going to have a case go before the Supreme Court on this     The facts are pretty good. The facts fit the government pretty well. Let me ask you a question that deals differently. I want to deal with the other issue, and that was the one about the quantity possessed or distributed under the guidelines and whether the relevant conduct issue. My time is going to be up, Judge Smith, with permission to judge Connell. Answer the question, please. The answer to your question is Carly Torres sold, on October 25th, one ounce of methamphetamine to Mr. Mahan. Yes. On December 1st, there was an eighth of an ounce, 3.5 grams, sold to these or given to these young men that was cut quite badly, as we acknowledge. Two days later, we have Carly Torres back in the scene, the drug dealer, and Mr. Mahan saying he wants another half ounce of meth. What Judge Aiken did is put those facts together, as did the probation officer when she had him walk through the facts that justified the calculation. And she found, under those facts, that the government had satisfied its burden that, under the guidelines, that the guideline level is what suggested by the probation officer, which I believe was 28. And what's the standard of review for that particular decision for us? If you know, since Cardi came down, Judge, I think what you have to look at is to see if there's a procedural error that is harmful. And if there has been a miscalculation of the sentencing guidelines, that's harmful. And you have to remand it for recalculation. Now, what's the standard of review after the Cartet decision came down, after Kimbrough and the progeny of cases? Judge, I think you're safer if you're going with the – I think you're safer with a de novo review. But can I tell you what it is currently? I don't know that. There's all sorts of reviews. The old days, under the guidelines, it used to be preponderance of the evidence, but it used to be clear and convincing if the guideline level was too great, which you gentlemen want to do in this case, it's up to you. My time's up. Thank you. Thank you, counsel. We'll hear from Ms. Wood. You have some reserve time. Your Honors, I'll be very brief. Again, to the extent that the Court's ruling in this case creates a circuit split, I would urge the Court to reach the narrow issue of whether an individual who uses his drugs as partial payment for firearms, in other words, to facilitate acquisition of the firearms, thereby violates the possession and furtherance prong. I think that because all of the Ninth Circuit case law says that this is a very fact-specific inquiry to determine the nexus between the firearms and the gun – I'm sorry, and the drugs, that this Court should make a narrow ruling. And again, it would be, I guess, up to the government to argue that that would create a circuit split, because as I read Frederick's and Luke Sanchez, their reasoning is that drug deals would not occur but for the willingness of the drug dealer to take the firearms in payment for his drugs. And that's not the fact specifics that the parties agree to and that the Court has before it in this case. Thank you. Thank you, counsel. The case just argued will be submitted for decision. And the Court will hear argument next in Cumbie v. Woody Woo, Inc. As counsel – as counsel will approach for the appellants, I'm going to ask the Deputy Clerk to set the clock for eight minutes for the attorney for Misty Cumbie and seven minutes afterward, after the first eight minutes argument has concluded, that the Secretary of Labor will get seven minutes and the clock will be set accordingly.
judges: Wolle, O'scannlain, Smith M.